JUSTICE LaVECCHIA delivered the opinion of the Court.
*304 **33 This appeal involves questions about the insurance coverage available to defendant Honeywell International, Inc. (Honeywell), a New Jersey based corporation, for thousands of bodily-injury claims premised on exposure to brake and clutch pads (friction products) containing asbestos. We granted certification to address **34 two issues. First, we consider whether the law of New Jersey or Michigan (the headquarters location of Honeywell's predecessor when the disputed excess insurance policies were issued) should control in the allocation of insurance liability among insurers for nationwide products-liability claims. Second, we address whether it was error not to require the policyholder, Honeywell, to contribute in the allocation of insurance liability based on the time after which the relevant coverage became unavailable in the marketplace (that is, since 1987).
In addressing the allocation question, we note that Honeywell does not seek coverage in this dispute for claims that involve initial product exposure occurring after insurance was not available and while the policyholder continued to manufacture the product. Although some of the claims presented involve injury that manifested after the date of excess-insurance unavailability, the class of claims to be addressed by the coverage block of insurance all presume that product exposure predated the insurance unavailability. Thus, consistent with New Jersey's continuous-trigger doctrine, Honeywell is seeking coverage under excess insurance policies for claims only from exposure occurrences during the period of policy coverage.
Different jurisdictions approach pinpointing the occurrence of injury using varying methodologies. We, and a majority of jurisdictions, rely on medical science that teaches asbestos-related disease is progressive, as body tissue is injured when an individual inhales asbestos fibers. Owens-Illinois, Inc. v. United Ins. Co., 138 N.J. 437, 454, 650 A.2d 974 (1994). That concept led to our adoption of the continuous-trigger doctrine in insurance liability allocation, which assumes progressive injury in each policy year following initial exposure. See ibid. To some extent that determination involves a legal fiction. Id. at 457, 650 A.2d 974. However, by allocating responsibility based on the date of initial exposure and every policy year thereafter, we maximize the insurance resources available to claimants suffering bodily injury.
**35 Under our current law on allocation of liability among insurers, an insured is not forced to assume responsibility in that allocation during the insurance coverage block of policies for years in which insurance is not reasonably available for purchase. Id. at 478-79, 650 A.2d 974 (referring to unavailability rule).
The trial court and the Appellate Division both concluded that New Jersey law applied, although for different reasons. Both courts further determined that, under the circumstances, the second question must be answered in the negative.
For the reasons that follow, we also hold that New Jersey law on the allocation of liability among insurers applies in this matter, and we set forth the pertinent choice-of-law principles to resolve this dispute over insurance coverage for numerous products-liability claims.
Concerning the second question, on these facts, we also affirm the determination to follow the unavailability exception to the continuous-trigger method of allocation set forth in Owens-Illinois.
I.
The unpublished Appellate Division decision in this matter distilled the extensive *305 record developed by the trial court. We draw from the panel's summary of the facts and procedural history and credit the panel for its fine work.
A.
By way of general background, The Bendix Corporation (Bendix)-a corporate predecessor to defendant Honeywell-for many years manufactured and sold friction products that contained asbestos. Bendix stopped using asbestos in its friction products in 2001, having continued to manufacture the items even after 1987 when insurance for asbestos-related claims for such products ceased to be available in the marketplace.
Beginning around 1975, Bendix began to receive liability claims asserting that asbestos in its friction products caused bodily injury **36 to users. In the years leading up to the summary judgment proceedings in this matter, Bendix and its successors received approximately 147,000 claims, of which about 71,000 have been resolved. Claimants sued Bendix in almost all fifty states, and its insurers have spent more than $1 billion on indemnity payments.
Certain matters are undisputed. The friction products contained asbestos. Honeywell is responsible for asbestos liabilities attributed to Bendix, although it disputes the dangerousness of its friction products. And, excess insurance coverage for asbestos-related personal injury claims became unavailable for purchase after April 1, 1987.
In 2000, Continental Insurance Company (Continental) (which wrote many primary insurance policies for Bendix during the relevant years), and related companies, commenced this action seeking declaratory relief concerning the rights and obligations associated with insurance coverage for the asbestos-related bodily injury claims filed against Honeywell as a corporate successor to Bendix. Bendix advanced cross-claims and third-party claims against various insurers, including Travelers Casualty & Surety Company (Travelers) and St. Paul Fire and Marine Insurance Company (St. Paul).
Honeywell settled with Continental and most other insurers. The ten insurance policies that remain at issue involve excess insurance issued to Bendix by Travelers and St. Paul. Eight of the policies were issued to Bendix by Travelers's predecessor, Aetna Casualty & Surety Company (Aetna). Two of the policies were issued by St. Paul. St. Paul was since acquired by Travelers but is separately identified for purposes of this appeal.
The choice-of-law issue in this matter arose from the following procedural actions. Honeywell filed a motion for partial summary judgment in 2006, asking the court to apply New Jersey insurance allocation law while opposing the application of Michigan law. Travelers opposed Honeywell's motion and filed a cross-motion, seeking the application of Michigan law to its policies. St. Paul did not oppose Honeywell's motion or make a separate motion. The **37 motion judge granted Honeywell's motion, denied Travelers's cross-motion, and held that the laws of New Jersey would apply to the insurance allocation questions. The court memorialized its order on November 9, 2006.
With that general background in mind, we turn to some finer details.
B.
Bendix was incorporated in 1929 under the laws of the State of Delaware. Aspects of its business took place in different states. During the course of its corporate existence, Bendix had manufacturing operations in all fifty states and twenty-two foreign countries, and sold its products *306 throughout the United States. Administratively though, from about 1940 to 1969, Bendix maintained its headquarters in South Bend, Indiana, while also having central offices in Detroit and New York. Its insurance office was in South Bend. Between 1969 and 1983, Bendix situated its executive headquarters, including its insurance office, in Michigan; another central office was in New York. Bendix also had significant contacts with New Jersey. Until 1973, Bendix's largest center of operations and payroll was in New Jersey.
Bendix had a variety of businesses, spanning such areas as automotive products, aerospace products, industrial products, financial services, and others. Included among its products are those at the center of the claims at issue here: friction products.
Bendix and its successors manufactured asbestos products in New York from 1939 until 2001 and in Tennessee from 1965 through 2001. As noted, asbestos ceased to be used as a component of the friction products in 2001.
Honeywell is the corporate successor to Bendix as a result of the following corporate changes. The Allied Corporation (Allied) acquired Bendix in 1983 and operated it as a wholly owned subsidiary, assuming Bendix's obligations and liabilities. Allied was incorporated under the laws of the State of New York and had its **38 principal place of business in New Jersey. In 1985, Allied and Signal Companies merged, becoming wholly-owned subsidiaries of The Allied-Signal Inc., a new Delaware corporation that also has been headquartered in New Jersey since the merger. The Allied-Signal Inc. changed its name to AlliedSignal Inc. in 1993; AlliedSignal Inc. merged with Honeywell, Inc., in December of 1999 and changed its name to Honeywell. Honeywell was incorporated under the laws of the State of Delaware, but its headquarters and principal place of business have always been located in Morristown, New Jersey.
Since 1983, all insurance operations for Bendix and its successors have been located in New Jersey. In total, Honeywell has purchased more than $3.5 billion in umbrella and excess insurance for Bendix's and its successors' liabilities from insurers whose principal places of business were located in over fourteen states and countries, including New Jersey.
It appears not to be disputed that the excess insurance policies, which were not subject to settlement before the trial court, were all brokered, issued, and delivered to Bendix in Michigan. Travelers's predecessor, Aetna, issued its disputed policies to Bendix between 1977 and 1983; St. Paul issued its disputed policies between 1968 and 1970. None of the policies contain a choice-of-law provision governing the allocation issue before us.
C.
As noted, the trial court granted Honeywell's motion for partial summary judgment in 2006, holding that New Jersey insurance-allocation law would apply in this matter.
When, in 2011, the motion court addressed motions for partial summary judgment that involved the dispute over the duration of the coverage block of insurance, the parties were eleven years into the case. The parties asked the court to consider resolving six issues as a matter of law, as well as to appoint a special allocation master as Owens-Illinois suggested would be appropriate for complicated, long tail, asbestos-injury-claims cases.
**39 The duration of the coverage block teed up the issue of the unavailability rule's application in this matter. All parties agreed that the beginning point would be *307 1940. Continental, the primary insurer for many years, started paying out claims in the 1980s, before Owens-Illinois was decided in 1994. It had some years in which its policy had no upper limit. Consistent with promoting the interests of its insured, it began paying claims for claimants and to assist Bendix and its successors in the resolution of claims, leaving coverage disputes to be resolved independently. Eventually, Continental assigned to Honeywell its rights with respect to the primary's responsibilities under allocation. That assignment included the considerable complication that its records made it difficult to determine how Continental had been variously assigning costs (i.e., defense costs or liability costs and to which matter), which affected the order of exhaustion of policies among insurers. As the record highlights, between 1980 and 1994, Continental's assignment of past defense costs was unclear and, once those costs could be identified, required assessment in respect of the allocation theory to be applied to this matter. That and other issues were implicated in this complicated matter of insurance liability allocation that was the essence of the complaint in this matter.
The trial court determined that one law on allocation should apply and that should be New Jersey law. That approach allowed the court to use one set of rules to sensibly and coherently allocate responsibility among insurers, over decades of actions, and the many payments already made by insurers, as well as the insured, depending on the policy-imposed obligations and coverage limitations held to apply. And, the court's determination was consistent with previous decisions that recognized that Owens-Illinois could be applied retroactively, including for defense costs. See Champion Dyeing & Finishing Co. v. Centennial Ins. Co., 355 N.J. Super. 262, 270-71, 810 A.2d 68 (App. Div. 2002) ; see generally Chem. Leaman Tank Lines, Inc. v. Aetna Cas. & Sur. Co., 177 F.3d 210, 229-31 (3d Cir. 1999) (applying Owens-Illinois retroactively).
**40 The determination of the coverage block was immensely important to the continued resolution of the issues. The Owens-Illinois allocation methodology, simply described, looks at the time on the risk horizontally and the total limits in each annual period vertically. Thus, an endpoint to the coverage block of insurance to be divvied up for claims and defense costs is essential to the calculation and to the assignment of risk to be borne by primary insurers and exhausted in each policy year before the excess insurer is tapped for its contributions for that year.
Owens-Illinois utilizes that allocation approach, recognizing also a continuous-trigger doctrine to explain the basis for recognizing occurrences in the year of first exposure to asbestos and in each subsequent policy year. To avoid having its insurance triggered, an insurer has the burden of showing that exposure did not occur earlier or during the policy year for which it wrote coverage for the insured. Otherwise, manifestation of injury presenting itself thereafter resulted in allocation of that individual's claim, in accordance with mathematical formulae, to that insurer's policy year.
It was within the context of that setting and law that the motion court considered the parties arguments over the duration of the coverage block. Travelers (taking the lead in argument) and St. Paul, both excess insurers, argued that the coverage block should run until the year in which Honeywell, as the successor to Bendix, ceased manufacturing the friction products-2001. Honeywell maintained that the coverage block should end in the 1986-87 period when first primary (1986) and then excess (April 1, 1987) insurance ceased to *308 be available. To the excess insurers, Honeywell was arguing for truncating the insurance coverage block. To Honeywell, Travelers was arguing for extenuation of the insurance coverage block.
The unavailability rule's application in this case became a point of debate. Travelers asserted earlier in this matter that a fact question existed about whether insurance was available in the marketplace. In 2007, another motion judge ordered discovery and **41 a hearing on that question. When the presently discussed motion for partial summary judgment came before the deciding motion judge, the court concluded that there was no genuine issue of fact concerning the question. The court held that commercial policies were not available to Honeywell beginning with the 1986/87 period as it had maintained, and we note that fact determination is not challenged in this appeal.
As a result of the discovery that had taken place though, Travelers also argued, in connection with the partial summary judgment motion, that Honeywell was self-insured. In advancing that argument, it pointed to the company's maintenance of corporate reserves. Travelers further argued that Honeywell had assumed the risk and should be treated as responsible for the years that it continued to manufacture friction products after 1987 until 2001-another fifteen years, which would reduce the exposure of the excess carriers in the allocation methodology form that which would occur under a coverage block that ended in 1987.
With respect to the reserves, the trial court dismissed the argument that maintenance of reserves is the equivalent of self-insurance. The court also rejected the argument that somehow that business practice of maintaining reserves represented an assumption of insurance risk relevant to resolution of the coverage block dispute.
The focal point to the argument and decision by the court was the unavailability rule application, or not, to determining triggered years of insurance for purposes of allocation under the Owens-Illinois paradigm.
On that point, the court heard from Travelers the arguments that continued manufacturing by Honeywell from 1987 to 2001 increased the number of pre-1987 exposure claims, increased the potential value of pre-1987 claims by alleged enhanced injury from continued exposure, and resulted in encouraging more people to file claims based on pre-1987 exposure.
**42 Honeywell argued that the record lacked factual or expert evidence to support those assertions of inference. Moreover, Honeywell emphasized that Owens-Illinois allocation theory addressed assumption of insurance risk not assumption of tort risk.
Ultimately, the trial court agreed with Honeywell that the insurance coverage period should not be extended, as Travelers requested, to include years from 1987 to 2001. Applying Owens-Illinois's approach to allocation of insurance risk to claims arising exclusively from pre-1987 initial exposure, the court determined that the unavailability of commercial insurance should end the coverage block of insurance. Hence, the decision fixed with certainty the policies, with their specific terms and amounts, that were available for the special master to consider when allocating among insurers and Honeywell for that period of time alone. That July 22, 2011 decision had the result of not requiring the court, or anyone else, to attempt to determine how policy amounts or limits or related insurance concerns for post-1987 years would be overlaid on Honeywell during the 1987-2001 period when manufacturing continued or how such corporate finances *309 would be sorted out between post- and pre-1987 claims.
After the parties consented to the appointment of a special allocation master (SAM), this matter proceeded before the SAM with policy years, policies, and amounts certain for the period of 1940-1987 as he addressed the already complicated issues before him. As the SAM's initial report to the trial court clearly noted before delving into the difficult issues assigned to him,
[a] Bendix asbestos claim triggers those policies issued to Bendix and/or Honeywell that were in effect during the portion of the Trigger Period that is within the coverage block. Exposure to an asbestos product shall be presumed to be exposure to a Bendix product, with the burden shifting to each insurer to prove that there was no exposure to a Bendix product before or during its policy period. There is no coverage under a policy where the claimant's first exposure to asbestos from a Bendix product takes place after the effective period of a given policy expired.
After holding hearings and hearing argument, the SAM issued a report and supplemental report containing recommendations on allocation. The trial court adopted the SAM's recommendations, with one exception not relevant to this appeal, and entered a final **43 judgment on September 16, 2013. By the time this matter reached appellate processes, almost all claims had settled.
D.
Travelers and St. Paul jointly appealed the trial court's two orders to the Appellate Division. They appealed the November 9, 2006 order, which granted Honeywell's partial summary judgment motion and applied New Jersey allocation law, and the July 22, 2011 order, which granted Honeywell's partial summary judgment motion and held that Honeywell had no allocation responsibility because after 1987 it was not able to obtain insurance coverage for asbestos claims. The Appellate Division affirmed the trial court but required a limited remand not pertinent to this appeal.
The appellate panel considered the trial court's choice-of-allocation-law ruling only as applied to Travelers's eight excess policies.[1] In its substantive review of that question, the panel determined that there was a conflict between the insurance-allocation methodologies of New Jersey, as determined by Owens-Illinois, and the Michigan time-on-the-risk methodology, espoused by the Michigan Court of Appeals in Arco Industries Corp. v. American Motorists Insurance Co., 232 Mich.App. 146, 594 N.W.2d 61 (1998) ( Arco ), aff'd by an equally divided court, 462 Mich. 896, 617 N.W.2d 330 (2000). The appellate panel found inapplicable the Restatement (Second) of Conflict of Laws (Am. Law Inst. 1971) (Restatement ) § 193, entitled "Contracts of Fire, Surety or Casualty Insurance," because its site-specific approach was inconsistent with Travelers's nationwide insurance policies and Bendix's selling of the friction products throughout the United States. The appellate panel instead analyzed the issue through Restatement §§ 188 and 6. The panel particularly relied on the § 6 factors, as distilled by this Court in **44 Pfizer, Inc. v. Employers Insurance, 154 N.J. 187, 198-99, 712 A.2d 634 (1998). The appellate panel considered the public policy interests of both states; the *310 interests of commerce among the states; the interests of the parties, including an evaluation of where the insurance policies were brokered, negotiated, underwritten, and issued; and the interest of judicial administration. Ultimately, the panel agreed with the trial court and concluded that the choice-of-law analysis supported the application of New Jersey law to Travelers's eight excess policies, which were in effect between February 1, 1977 and October 1, 1983.
The appellate panel further agreed with the trial court that, under Owens-Illinois, Honeywell was not required to contribute to allocation for pre-1987 initial exposure claims even if the claimant did not manifest injury until after 1987, given that excess insurance for asbestos-related claims was not reasonably available for purchase after 1987.
St. Paul and Travelers petitioned this Court for certification, raising both the choice-of-law and allocation issues. We granted their petition. 228 N.J. 437, 157 A.3d 852 (2016).
II.
Turning first to the choice-of-law question, the parties disagree on the outcome of the first step in that inquiry: whether a true conflict exists. Travelers contends there is a difference in the methodologies of the two states. Honeywell, on the other hand, maintains that Michigan has not clearly adopted a set methodology and, so, it has no policy with which New Jersey's methodology can be said to conflict.
Assuming there is a conflict requiring a choice-of-law determination, the parties differ as to the proper analytic approach and the outcome.
Travelers asks this Court to resolve and clarify the relationship between Restatement §§ 193 and 188 and our prior decisions and focuses in particular on State Farm Mutual Automobile Insurance Co. v. Estate of Simmons, 84 N.J. 28, 417 A.2d 488 (1980).
**45 Travelers acknowledges that our law has moved from a lex-loci-contractus approach toward a most-significant-relationship approach in contract disputes. However, Travelers emphasizes that
the law of the place of the contract ordinarily governs the choice of law because [that] rule will generally comport with the reasonable expectations of the parties concerning the principal situs of the insured risk during the term of the policy and will furnish needed certainty and consistency in the selection of the applicable law.
[ (quoting Simmons, 84 N.J. at 37, 417 A.2d 488 ).]
Travelers maintains that we have directly addressed choice-of-contract-law questions only in the context of environmental coverage disputes and not in circumstances akin to those present here, where a products-liability case has resulted in claims across the nation. It argues that New Jersey's site-specific choice-of-law approach for environmental disputes is not well suited for products-liability cases in which insurance contract disputes arise.
Here, Travelers maintains that, because the insurance contracts at issue were brokered, negotiated, underwritten, issued, and delivered to Bendix in Michigan, the presumption under Simmons and Restatement § 193 in favor of application of the law of the place of contract should result in a presumptive application of Michigan law in this matter. Travelers asserts that no state has an interest that overcomes, in this instance, the presumption that a court should apply the laws of the site of contracting.
Honeywell disagrees that Simmons's purported presumption-that the site of the place of contract is of paramount importance -is *311 applicable in these circumstances. It argues that we have rejected adopting the law of the site of the contract as the presumptive law and urges consideration of the comparative interests of the respective states. Here, Honeywell urges application of the Restatement § 6 factors, as distilled in Pfizer. Applying those factors, Honeywell argues that the relative interests of Michigan are minimal compared to the interests of New Jersey.
We reserve a more granular discussion about the § 6 factors, as they pertain in this matter, for our later analysis.
**46 III.
We begin with familiar terrain. Choice-of-law questions involve legal determinations, and therefore our review is de novo. McCarrell v. Hoffmann-La Roche, Inc., 227 N.J. 569, 583-84, 153 A.3d 207 (2017). Furthermore, when a civil action is brought in New Jersey, we use New Jersey choice-of-law rules to decide whether this state's or another state's legal framework should be applied. Id. at 583, 153 A.3d 207.
A.
The first step in a conflicts analysis is to decide whether there is an actual conflict between the laws of the states with interests in the litigation. P.V. ex rel. T.V. v. Camp Jaycee, 197 N.J. 132, 143, 962 A.2d 453 (2008). "If there is no actual conflict, then the choice-of-law question is inconsequential, and the forum state applies its own law to resolve the disputed issue." Rowe v. Hoffman-La Roche, Inc., 189 N.J. 615, 621, 917 A.2d 767 (2007). A conflict of law requires a "substantive difference" between the laws of the interested states. DeMarco v. Stoddard, 223 N.J. 363, 383, 125 A.3d 367 (2015). A "substantive difference" is one that "is offensive or repugnant to the public policy of this State." Ibid.; see also McCarrell, 227 N.J. at 584, 153 A.3d 207 (noting statute of limitations difference was "outcome determinative" to question before Court). Here, we agree with the appellate panel's determination that there is a substantive difference between the New Jersey and Michigan approaches to determining the allocation of liability between manufacturers and insurers for injuries that progress after exposure to an allegedly toxic substance.
1.
New Jersey law employs the continuous-trigger doctrine, as initially adopted by this Court in our seminal case on insurance allocation, Owens-Illinois, 138 N.J. 437, 650 A.2d 974.
**47 In Owens-Illinois, we held "that when progressive indivisible injury or damage results from exposure to injurious conditions for which civil liability may be imposed, courts may reasonably treat the progressive injury or damage as an occurrence within each of the years of [the insurance] policy." Id. at 478, 650 A.2d 974. We acknowledged that "injury may mean different things in different contexts" and that "the point at which the law will say that injury requires indemnity" is not "easily understandable." Id. at 457, 650 A.2d 974. "In that sense," we noted, "the concept of injury, like the related concepts of duty and causation, is an instrument of policy." Ibid. We reviewed the approaches taken by other jurisdictions to that same question, id. at 459-68, 650 A.2d 974, and ultimately settled on the continuous-trigger theory of liability as a matter of compelling public policy, id. at 478, 650 A.2d 974. We held that "courts may reasonably treat the progressive injury or damage as an occurrence within each of the years of a *312 CGL [ (comprehensive general liability insurance) ] policy." Ibid.
Given that the continuous-trigger theory would implicate multiple insurance policies, we also adopted a methodology for allocating liability among those policies. Id. at 474-75, 650 A.2d 974. Under that approach, when determining an insurer's liability, a court is to consider both the insurer's time on the risk and the degree of risk that insurer assumed. Ibid. That entails "proration on the basis of policy limits, multiplied by years of coverage." Id. at 475, 650 A.2d 974.
Several policy rationales were at work in the Owens-Illinois approach. See id. at 472-76, 650 A.2d 974. Our decision identified the goals sought to be achieved through the designated allocation approach. Specifically, we sought to (1) "make the most efficient use of the resources available to cope with environmental disease or damage," id. at 472, 650 A.2d 974 ; (2) encourage "responsible conduct that will increase, not decrease, available resources," ibid.; (3) spread risk among multiple insurers, id. at 472-73, 650 A.2d 974 ; (4) encourage policyholders to purchase coverage every year, **48 ibid.; and (5) serve "principles of simple justice," id. at 473, 650 A.2d 974.
It bears repeating here, as we emphasized then, that the theory underlying insurance is risk allocation. Id. at 472, 650 A.2d 974. "Because insurance companies can spread costs throughout an industry and thus achieve cost efficiency, the law should, at a minimum, not provide disincentives to parties to acquire insurance when available to cover their risks. Spreading the risk is conceptually more efficient." Id. at 472-73, 650 A.2d 974. We said that an insurance allocation scheme that spreads costs throughout the industry and promotes an efficient use of resources translates to more money available to respond in the event of disease and damage. Id. at 478, 650 A.2d 974.
This Court has continued to emphasize those public interest effects when, for example, extending the allocation principles to include excess insurance in its methodology. See Carter-Wallace, Inc. v. Admiral Ins. Co., 154 N.J. 312, 325-27, 712 A.2d 1116 (1998) (rejecting excess insurers' horizontal exhaustion theory and adopting vertical loss allocation by year as keeping with policy principles of Owens-Illinois ); see also Spaulding Composites Co., Inc. v. Aetna Cas. & Sur. Co., 176 N.J. 25, 39-42, 819 A.2d 410 (2003) (reinforcing primacy of Owens-Illinois's policy goals when rejecting enforcement of non-cumulation clause in CGL policy).
In sum, we have in New Jersey a longstanding allocation approach built on a continuous-trigger theory premised on the notion that asbestos and other progressive environmental injuries are multiple occurrences and must be treated as such. See Benjamin Moore & Co. v. Aetna Cas. & Sur. Co., 179 N.J. 87, 104, 843 A.2d 1094 (2004) ("The multiple occurrence template is a matter of substance that is at the heart of Owens-Illinois."). Our methodology for determining allocation of liability among insurers whose policies cover asbestos-related diseases over a period of years considers both the insurers' time on the risk and the degree of risk assumed. Insurers do not share a single loss under that methodology; rather, each is made responsible for losses on its **49 watch, subject to the limits of the policy each has written, "as calculated in accordance with a formula we developed as a proxy for a scientific assessment of the amount of injury happening at each phase on the continuum." Id. at 105, 843 A.2d 1094.
2.
Michigan utilizes a different allocation method.
*313 A pro rata allocation theory based on a "time-on-the-risk" methodology was adopted by the intermediate Court of Appeals in Arco, 594 N.W.2d at 68-69.[2] That approach "allocates liability among triggered policies using the periods covered by each insurer without considering the coverage limits of the triggered policies." Id. at 68. Although a majority of the Michigan Supreme Court did not vote to affirm Arco, lending it "diminished precedential value," In re Martin, 237 Mich.App. 253, 602 N.W.2d 630, 632 n.2 (1999), Arco remains precedential nonetheless, see Mich. Ct. R. 7.215(J)(1) ; see also Stoner v. N.Y. Life Ins. Co., 311 U.S. 464, 467, 61 S.Ct. 336, 85 L.Ed. 284 (1940) (holding that federal courts in diversity jurisdiction cases "must follow the decisions of intermediate state courts in the absence of convincing evidence that the highest court of the state would decide differently").[3]
**50 Importantly, in Arco, the Michigan Court of Appeals specifically considered and rejected the Owens-Illinois approach, concluding that the policy considerations articulated by commentators weighed in favor of adopting the time-on-the-risk method:
The time-on-the-risk method should be adopted by courts because its inherent simplicity promotes predictability, reduces incentives to litigate, and ultimately reduces premium rates.
Courts can easily administer the time-on-the-risk method. Once a court determines the scope of the progressive injury, that is, the total damage[,] ... it can readily allocate the damages among the triggered policies....
Unlike the Owens-Illinois method, the effects of deductibles, excess insurance, and self-insurance are easy to calculate by pretending that the policy's share of damages was the damage that actually occurred during that policy period.
....
The simplicity of the time-on-the-risk method removes many of the incentives to litigate the allocation of damages. Since the parties will know in advance how the court will allocate liability, there is much less of the uncertainty that encourages wasteful litigation....
In addition to decreasing the amount of litigation, this method provides a way for insurance companies to estimate more accurately total expected liability; as a result premiums should decline.... Because this method, unlike the Owens-Illinois method, does not rely on a case-by-case determination of how much coverage was purchased, it also obviates the concern about inconsistent application.
[ Arco, 594 N.W.2d at 69 (first and fifth ellipses in original) (quoting Michael G. Doherty, *314 Allocating Progressive Injury Liability Among Successive Insurance Policies, 64 U. Chi. L. Rev. 257, 281-83 (1997) ).]
In sum, a substantive difference separates the New Jersey and Michigan legal approaches and policy considerations for the insurance allocation question at issue, and so we must engage in a choice-of-law analysis for determining which state's allocation framework applies.
To that question we now turn.
B.
1.
Turning to New Jersey's rules on conflicts of laws in the setting of insurance contracts and multiple claimants, we begin, as urged **51 by Travelers, with Simmons, because that case marked the beginning of this Court's modernization of conflicts law.
Our Court rejected the former choice-of-law rules of lex loci contractus (for insurance contracts), see Simmons, 84 N.J. at 36-37, 417 A.2d 488, and lex loci delicti (for torts), see Veazey v. Doremus, 103 N.J. 244, 247-49, 510 A.2d 1187 (1986), in favor of using a more flexible "governmental interest" standard that comes from the Restatement. When we took that step in Simmons, the choice-of-law question involved the limits of automobile insurance coverage issued in Alabama to an Alabama insured who, shortly after temporarily relocating to New Jersey, became involved in a car accident in New Jersey. 84 N.J. at 30, 417 A.2d 488. In Simmons, the Court held that when the judiciary is called on to determine choice-of-law principles in the context of interpreting an "automobile liability insurance contract, the law of the place of the contract will govern the determination ... unless the dominant and significant relationship of another state to the parties and the underlying issue dictates that this basic rule should yield." Id. at 37, 417 A.2d 488. We ultimately found no cogent reason not to follow Alabama law on automobile liability insurance in the resolution of the claims in the litigation. Id. at 38, 417 A.2d 488.
In explaining the proper conflict-of-law analysis when multiple parties and insurers were involved, our Court stated that the
proper approach in resolving conflict-of-law issues in liability insurance contract controversies ... in both the contract field as well as in the somewhat related tort field ... calls for recognition of the rule that the law of the place of the contract ordinarily governs the choice of law because this rule will generally comport with the reasonable expectations of the parties concerning the principal situs of the insured risk during the term of the policy and will furnish needed certainty and consistency in the selection of the applicable law.
[ Id. at 37, 417 A.2d 488.]
2.
In Simmons, we relied on § 193 of the Restatement. Id. at 35-36, 57, 417 A.2d 488. Section 193, addressing conflicts of law in the **52 specific setting of contracts of fire, surety or casualty insurance, provides that
[t]he validity of a contract of fire, surety or casualty insurance and the rights created thereby are determined by the local law of the state which the parties understood was to be the principal location of the insured risk during the term of the policy, unless with respect to the particular issue, some other state has a more significant relationship under the principles stated in § 6 to the transaction and the parties, in which event the local law of the other state will be applied.
Since Simmons, this Court has continued to confront conflict-of-law questions concerning *315 insurance coverage in complex settings involving mass torts. In those subsequent cases, we have discussed the role of two other pertinent Restatement provisions that warrant identification before proceeding to review those cases.
Section 188 of the Restatement generally addresses conflicts-of-law determinations in contract settings where the parties have not made an effective choice of law. It provides that "[t]he rights and duties of the parties with respect to an issue in contract are determined by the local law of the state which, with respect to that issue, has the most significant relationship to the transaction and the parties under [the § 6 factors]." More specifically, subparagraph (2) of § 188 identifies the contacts to be considered when applying the § 6 factors. They are:
(a) The place of contracting,
(b) The place of negotiation of the contract,
(c) The place of performance,
(d) The location of the subject matter of the contract, and
(e) The domicil, residence, nationality, place of incorporation and place of business of the parties.
Section 6 of the Restatement sets forth several generic conflicts-of-law principles. In particular, it sets forth the factors that are relevant in a conflicts determination when there is no local statutory directive controlling the issue. Specifically, Section 6 provides:
[T]he factors relevant to the choice of the applicable rule of law include
(a) the needs of the interstate and international systems,
(b) the relevant policies of the forum,
(c) the relevant policies of other interested states and the relative interests of those states in the determination of the particular issue, **53 (d) the protection of justified expectations,
(e) the basic policies underlying the particular field of law,
(f) certainty, predictability and uniformity of result, and
(g) ease in the determination and application of the law to be applied.
With those additional Restatement sections in mind, we turn back to review our case law in this area.
3.
In Gilbert Spruance Co. v. Pennsylvania Manufacturers' Ass'n Insurance Co., 134 N.J. 96, 97, 629 A.2d 885 (1993), we considered choice of law regarding insurance coverage in the context of a mass tort. Specifically, we granted certification to address "whether a comprehensive general liability policy containing a pollution exclusion, issued by an out-of-state carrier and covering an out-of-state defendant's operations, should be construed pursuant to New Jersey law." Ibid. Ultimately, we affirmed the Appellate Division's holding that when it is reasonably foreseeable to parties to an insurance contract that a New Jersey waste site will obtain the insured's waste products, our substantive law dictates the interpretation of the insurance agreement because New Jersey "had the dominant significant relationship." Id. at 98, 629 A.2d 885.
In Spruance, the plaintiff company (Spruance), a Pennsylvania corporation, manufactured paint products in Philadelphia and, in the 1970s and 1980s, "consigned its waste to independent waste haulers, who transported the waste to [dump sites] in New Jersey." Ibid. Four of those sites formed "the basis of multiple toxic-tort claims for personal injury and *316 property damage," which led New Jersey's then-Department of Environmental Protection to bring public remediation and enforcement actions. Ibid. During the pertinent period, Spruance had negotiated and purchased primary and excess insurance policies in Pennsylvania from a Pennsylvania corporation, covering plant operations in numerous states. Id. at 98-99, 629 A.2d 885. The policies contained a pollution-exclusion clause; accordingly, when Spruance submitted notice of claims arising from the New Jersey waste sites, the **54 insurance carrier disclaimed coverage based on the exclusion. Id. at 99, 629 A.2d 885. Spruance filed a declaratory judgment action in New Jersey on the coverage question, and New Jersey courts had to determine whether Pennsylvania or New Jersey law applied to the interpretation of the pollution-exclusion clause. Ibid.
In considering the conflicts-of-law question when the matter reached our Court, we restated our rejection of a "mechanical and inflexible lex loci contractus rule in resolving conflict-of-law issues in liability-insurance contracts," and referenced our "more flexible approach that focuses on the state that has the most significant connections with the parties and the transaction." Id. at 102, 629 A.2d 885. We noted that when determining the conflicts-of-law rule to govern casualty-insurance contracts, Restatement § 193 usually is initially consulted; however, we concluded that § 193 did not provide a satisfactory framework for the fact-specific question presented, explaining that
[i]f the principal location of the insured risk is in a single state for a major portion of the insurance period, that location "is the most important contact to be considered in the choice of the applicable law, at least as to most issues." However, the location of the risk has less significance when a movable risk is concerned or when "the policy covers a group of risks that are scattered throughout two or more states."
[ Id. at 104, 629 A.2d 885 (quoting Restatement § 193 cmt. b).]
In such factual settings, we recognized that a clear understanding about the principal location of the insured risk would not necessarily be present and so a different approach was warranted:
[W]hen the "subject matter of the insurance is an operation or activity" and when "that operation or activity is predictably multistate, the significance of the principal location of the insured risk diminishes" ... [and] the governing law is that of the state with the dominant significant relationship according to the principles set forth in Restatement section 6.
[ Id. at 112, 629 A.2d 885 (quoting Gilbert Spruance Co. v. Pa. Mfrs.' Ass'n Ins. Co., 254 N.J. Super. 43, 50, 603 A.2d 61 (App. Div. 1992) ).]
Spruance broke from the prior reliance on the place of the contract in Simmons. Rather, we determined that the Restatement §§ 188 and 6 provided a more useful framework for addressing the various interests at stake. We determined those Restatement sections to be analytically more appropriate "in the context of **55 commercial insurance and pollution exclusion involving out-of-state waste generation, multi-state waste generation, and in-state waste generation with the waste ultimately coming to rest in New Jersey." Spruance, 134 N.J. at 104, 629 A.2d 885.
Spruance's reach has been the subject of debate. Even we have commented that
[c]ourts have found it "tempting" to extract from Spruance a "bright-line rule" of applying the law of the state in which the waste disposal site is located as long as it was reasonably foreseeable to the contracting parties that the insured's *317 waste would predictably come to rest in that state.
[ Pfizer, 154 N.J. at 197, 712 A.2d 634.]
However, as clarified in Pfizer, "there is no way to avoid a careful site-specific determination, made upon a complete record." Ibid. (quotation marks omitted). When the risk is "to some degree transient," a court must use the Restatement § 6 factors in its analysis. Ibid. (quoting Spruance, 134 N.J. at 113, 629 A.2d 885 ). In Pfizer, this Court did that.
In that case, the Court relied on the factors in § 6, informed by reasoning from General Ceramics, Inc. v. Firemen's Fund Insurance Cos., 66 F.3d 647 (3d Cir. 1995), to articulate the interests to be considered in an environmental toxic tort setting when the location of the damage is ascertainable. Id. at 197-98, 712 A.2d 634. Although condensed and reframed into four inquiries, the Pfizer analysis nevertheless remained tethered to the section 6 factors:
1. The competing interests of the states [, which] require courts to consider whether application of a competing state's law under the circumstances of the case "will advance the policies that the law was intended to promote[;]" ...
2. The interests of commerce among the states [, which] require courts to consider whether application of a competing state's law would frustrate the policies of other states[;] ...
3. The interests of parties [, which] require courts to focus on their justified expectations and their needs for predictability of result[;] ... [and]
4. The interests of judicial administration [, which] require a court to consider whether the fair, just and timely disposition of controversies within the available resources of courts will be fostered by the competing law chosen.
[ 154 N.J. at 198-99, 712 A.2d 634 (quoting Gen. Ceramics, 66 F.3d at 656 ).]
**56 The Pfizer Court explained that, in considering the competing interests of the states, the inquiry should focus "on 'what [policies] the legislature or court intended to protect by having [the] law apply to wholly domestic concerns, and then, whether those concerns will be furthered by applying that law to the multi-state situation.' " Id. at 198, 712 A.2d 634 (first alteration in original) (quoting Gen. Ceramics, 66 F.3d at 656 ). The Court also noted that the "contacts" outlined in § 188 are relevant in order to "assess[ ] what parties might reasonably have expected to be predictable." Id. at 199, 712 A.2d 634 ; see also HM Holdings, Inc. v. Aetna Cas. & Sur. Co., 154 N.J. 208, 213-17, 712 A.2d 645 (1998) (applying Pfizer analysis to multiple choice-of-law questions in environmental-coverage dispute).
With that background, we turn to the conflict-of-law issue before us.
C.
1.
To begin, we reject the insurers' argument that Simmons requires this analysis to begin with Restatement § 193 and its presumption that the law of the place of contracting applies. We no longer follow lex loci contractus for insurance contracts and Simmons is factually distinct from this dispute. Simmons began with a presumption in favor of the law of the contracting state in an automobile-insurance-liability dispute, which was sensible in light of that state's relationship with the "principal situs of the insured risk." 84 N.J. at 37, 417 A.2d 488 ; see also Restatement § 193. Neither Simmons nor § 193 persuasively pertain in circumstances such as we have here: nationwide products-liability claims spanning many years of product exposure rather than a single occurrence event.
*318 Indeed, in Spruance, we clarified that "the location of the [insured] risk has less significance when a moveable risk is concerned or when 'the policy covers a group of risks that are **57 scattered throughout two or more states.' " 134 N.J. at 104, 629 A.2d 885 (quoting Restatement § 193 cmt. b). The insurance policies at issue here covered a scattered risk, insuring Bendix for liability related to a commercial product that the manufacturer distributed nationally. Unlike an environmental-coverage case, the insurers were not insuring a risk site. Michigan, as the place of contracting, did not relate to a risk site.
In a contract dispute over insurance allocation for nationwide products liability claims asserting bodily injury due to asbestos exposure, neither Restatement § 193 nor Simmons provides the proper starting point. The conflicts analysis here should center on Restatement §§ 188 and 6, as our later decisions in Spruance and Pfizer have taught.
2.
Section 188 sets forth the contacts to be taken into account in applying the principles of § 6. Section 6's factors, to the extent helpfully condensed in our Pfizer decision, fill out the inquiry.
With respect to the § 188 contacts with the states having an interest in the question of substantive law, not all of the contacts are of equal importance or value in this fact-specific inquiry. Having already abandoned the place of contracting (here Michigan) as the presumptive starting point, we adhere to the observation in Restatement § 188 cmt. e. on subsection (2), that "[s]tanding alone, the place of contracting is a relatively insignificant contact." That is particularly true where, as here, the insured risk is not site-specific. The place of negotiation (again Michigan) can be of importance, as recognized in the Restatement's comment to § 188.
However, two stronger considerations under § 188, applied to this matter, combine to point toward New Jersey. Here, the place of performance, § 188(c), and the domicile, residence, and places of incorporation and of business of the parties, § 188(e), all point to New Jersey. The latter takes into account enduring characteristics **58 and deserves to be a starting point in the analysis. Further, heavy weight must be given to the nature of the insured risk and its site, or to an otherwise performance-related location consideration. New Jersey is the longstanding domicile of the insured in this litigation (since 1983). Honeywell is the successor to the rights of Bendix under the insurance contract. As such, Honeywell's place of domicile and business (New Jersey) is easily determined at the time coverage is invoked due to litigation, triggering the terms of the insurance contract for these products liability claims. Relatedly, New Jersey is also the place of performance for the contractual defense and indemnification of Honeywell in this litigation involving long-tail claims on an occurrence policy for a predecessor's products cast into the national marketplace. Even before the New Jersey-based Honeywell became the successor to Bendix, New Jersey was integrally involved in Bendix's business operations. It is no stranger to the dispute.
With those contacts in mind, we turn to the Restatement's factors in section 6, helpfully condensed in Pfizer, for our analytical framework. The question is whether New Jersey's relationship with the case is sufficiently significant to warrant application of New Jersey law.
In examining the competing interests of the states, the first inquiry described in Pfizer consolidates several § 6 factors and asks, simply, whether application of the *319 competing states' laws would advance the policy interests that the law was intended to promote.
Owens-Illinois is very clearly a policy-driven opinion, identifying several policies sought to be promoted through application of our allocation methodology for progressive bodily injury claims based on asbestos exposure. Honeywell contends that application of the Owens-Illinois approach in this matter will promote those policies. We generally agree. The policies of maximizing insurance resources, encouraging the spreading of risk throughout the insurance industry, promoting the purchase of insurance when available, and considerations of simple justice all are important to this **59 state. Owens-Illinois and Carter-Wallace focused on those policies. Fulfilling them will benefit the State because they achieve worthy goals enhancing the interests of a New Jersey insured, and the claimants who were injured by progressive asbestos-related disease, by maximizing insurance resources and prompting insureds to obtain and maintain insurance coverage.
To the extent that Michigan's time-on-the-risk approach also seeks to benefit insureds and claimants, application of New Jersey's allocation law will not undermine those Michigan interests. Moreover, it is far from clear what interest Michigan has in insisting that its allocation methodology apply in this insurance dispute, which no longer involves a Michigan-based company.
Finally, although New Jersey's interest in the "efficient use of the resources available to cope with environmental disease or damage," Owens-Illinois, 138 N.J. at 472, 650 A.2d 974, may be less compelling in a products-liability case where the harm is not confined to New Jersey, the State's interest in "simple justice" will be advanced when the Travelers policies are subjected to the same New Jersey law as the St. Paul policies.
In sum, we do not see a strong Michigan interest in its allocation law being applied to this coverage dispute. This matter involves nationwide products-liability claims relating to items manufactured in virtually all fifty states and internationally, sold in the national marketplace, and that now are the liability of a successor, New Jersey-based corporation.
The second Pfizer factor considers commerce between the states. That factor is analytically similar to the prior one. It too supports application of New Jersey law. The inquiry focuses on "whether application of a competing state's law would frustrate the policies of other states." Pfizer, 154 N.J. at 198, 712 A.2d 634.
In addition to the competing interests of the states already discussed, the public policy goals further identified in Arco are prospective in nature. The Michigan Court of Appeals sought to promote predictability, discourage litigation, and reduce premiums.
**60 Arco, 594 N.W.2d at 70. Application of Michigan's time-on-the-risk method in this instance cannot discourage litigation among these parties. Further, it would not promote predictability. As the Appellate Division noted, neither Bendix nor its insurers could have anticipated at the time of contracting that Michigan would adopt that allocation method, which was not yet part of Michigan's law.
The third factor considers the interests of the parties. Here the contacts outlined in § 188 of the Restatement come to the fore. Courts look to the parties' justified expectations and need for predictability, as well as the other contacts outlined in § 188. Travelers asserts that Michigan law should govern because Michigan was the place of contracting. However, as the Appellate Division noted, when the parties entered the now-disputed excess insurance policies, they could not have reasonably *320 anticipated the later adoption of the time-on-the-risk approach in Michigan. The parties did know though that the Travelers policies covered risk related to products that Bendix sold nationwide. The risk was not stationary; it extended beyond Michigan's borders. We are unpersuaded by Travelers's contention that the parties expected Michigan allocation law to govern.
That said, we acknowledge that, at the time of contracting, the parties could not have expected New Jersey law to control either. However, section 188 directs courts to consider, among other factors, the place of performance, Restatement § 188(c), and the place of business of the parties, id. § 188(e). We already determined that we view those two contacts as strongest in the resolution of this dispute and both point toward New Jersey. We give great weight in this analysis to Honeywell's status as a New Jersey corporation responsible for liability for asbestos-related claims based on pre-1987 exposure to its friction products. We conclude that this factor supports application of New Jersey allocation law.
Finally, we look at the interests of judicial administration under the last Pfizer factor, which asks "what choice of law works best to **61 manage adjudication of the controversy before the court." 154 N.J. at 199, 712 A.2d 634. In Owens-Illinois, we designed special procedures for the resolution of allocation disputes in cases involving long-tail losses. 138 N.J. at 477-78, 650 A.2d 974. The Court placed its faith in the discretion of skilled masters and encouraged "the use of special case calendars, management conferences, monitoring, [and] alternative methods of dispute resolution." Ibid.
We agree with the Appellate Division that Pfizer's"special judicial framework" will best manage adjudication of this dispute. Travelers contends that procedural complexity will not serve the interests of judicial administration and argues instead for the simpler time-on-the-risk approach, which requires fewer resources. That argument fails to persuade, however, because the fourth factor focuses not only on resource use but also on "best manage[ment]" of the case. New Jersey's system is well suited to resolve a complex allocation controversy in a fair manner.
In sum, we conclude, in this contract setting where no provision of the contract or of state law compels application of a specific state's law, that conflicts-of-law principles favor application of New Jersey allocation law in the present dispute over liability among insurers. Accordingly, for the reasons expressed, we affirm the Appellate Division on the first issue and turn to the second, questioning the use of our unavailability exception in that allocation methodology.
IV.
The continuous-trigger and related unavailability exception theories for allocation of insurance liability have been recognized and applied in this state since the 1994 decision in Owens-Illinois. As previously discussed, in that matter, which involved toxic-exposure to asbestos, we addressed the use of pollution-exclusion clauses in insurance policies and their impact on the policyholder. After considering strong policy arguments presented by all parties, we settled on the continuous-trigger doctrine and its related allocation methodology as being best for purposes of **62 assessing liability and promoting risk management. 138 N.J. at 478-79, 650 A.2d 974. We determined to use that method of allocation of liability because we found it superior by virtue of (1) encouraging the acquisition of insurance and spreading costs throughout the industry; (2) promoting the efficient use of insurance resources to make more money available to respond *321 in catastrophic circumstances; (3) compelling insurers to minimize their costs; and (4) advancing principles of simple justice. Id. at 472-78, 650 A.2d 974.
The continuous-trigger method assumes the availability of insurance and incorporates recognition of an unavailability exception. As we explained in Owens-Illinois, "[w]hen periods of no insurance reflect a decision by an actor to assume or retain a risk, as opposed to periods when coverage for a risk is not available, to expect the risk-bearer to share in the allocation is reasonable." Id. at 479, 650 A.2d 974. The Court thus made it clear that a policyholder is not responsible for the pro rata portion of liability that reflects a period of insurance unavailability. Id. at 479, 650 A.2d 974. Courts have applied the "unavailability exception," in accordance with the language of Owens-Illinois, to require an insured to share in an allocation of liability under the continuous-trigger doctrine only when it foregoes purchasing available insurance. See Farmers Mut. Fire Ins. Co. of Salem v. N.J. Prop.-Liab. Ins. Guar. Ass'n, 215 N.J. 522, 538-39, 74 A.3d 860 (2013) (collecting cases); Champion Dyeing, 355 N.J. Super. at 276-77, 810 A.2d 68.
A.
In this appeal, St. Paul and Travelers ask this Court to create an equitable exception to the unavailability rule, whereby corporations that continue to manufacture products after insurance becomes unavailable for those products would be deprived of the insurance coverage they purchased prior to that unavailability. The insurers contend that the Appellate Division misapplied this Court's precedent when it held Honeywell was entitled to coverage, **63 asserting that the panel's application of Owens-Illinois conflicts with the public policy objectives underpinning that decision. They urge us to conclude that Honeywell's decision to continue to manufacture and sell products containing asbestos, after insurance was no longer available, should result in requiring Honeywell to contribute to the losses from its past and future sale of those products. They urge the Court to find an "exceptional circumstance" warranting departure from Owens-Illinois in this case. Thus, they claim that, for purposes of performing the allocation of risk, the coverage block of insurance should have been extended to include all years that Honeywell continued to manufacture the friction products. They assert that, otherwise, application of the unavailability rule will encourage manufacturers to behave irresponsibly. Manufacturers, they argue, will be allowed to transfer the risk of that subsequent (post-insurance unavailability) conduct to their prior insurers. They do not ask for this Court to overrule Owens-Illinois and its unavailability exception in the allocation methodology, but argue about its application to the facts of this case.
Joining with the insurers, as amicus curiae, is the Complex Insurance Claims Litigation Association (CICLA). CICLA's main argument is that this Court should abandon the unavailability doctrine altogether, an argument not raised by the insurers themselves. CICLA claims a trend in the law of other jurisdictions away from recognition of an unavailability exception. CICLA contends that the exception undermines the public policy objectives that support the allocation methodology of Owens-Illinois and encourages manufacturers to forego insurance while continuing to produce and sell potentially dangerous products. CICLA adds that the unavailability exception complicates insurance coverage litigation by creating additional issues requiring expanded discovery.
*322 In contrast, Honeywell primarily points to the record that establishes that excess insurance was no longer available after April 1987. Honeywell emphasizes that it is seeking coverage only **64 for claims alleging first exposure to a Bendix product before 1987-while Bendix and its successors had active occurrence-policy coverage for asbestos-based risks-even if manifestation occurred after that point in time. Honeywell stresses that, under existing law, their conduct after 1987 is not relevant because it does not affect the prior exposure for which they had purchased insurance. Thus, Honeywell contends, the Owens-Illinois unavailability rule was applied correctly and consistently with the policy objectives expressed in that opinion. Honeywell underscores that it is inaccurate for the insurers to contend that it is seeking to foist post-1987 conduct onto insurers. In the alternative, Honeywell contends that its adversaries misread Owens-Illinois to allow for liability allocation to an insured for a time when insurance was unavailable.
United Policyholders (UP), appearing as amicus curiae in support of Honeywell, argues that the trial court and Appellate Division appropriately applied the Owens-Illinois unavailability exception. UP notes that, in Owens-Illinois, the Court focused on the policyholder's conscious decision to forego the purchase of available insurance rather than the policyholder's decision to engage in a particular kind of business activity. In fact, UP contends, in Owens-Illinois the Court expressly contrasted a specific decision by an actor to assume or retain a risk during a period of no insurance with those periods when insurance coverage is not available. It too emphasizes that the record clearly establishes that excess-insurance coverage for asbestos risk was not available after 1987. UP further urges that we not abandon precedent because Owens-Illinois has offered certainty in its formula and has encouraged settlement of complex coverage disputes.
B.
We have affirmed that the continuous-trigger theory of liability is the law of this state multiple times since the decision in Owens-Illinois. For example, in Benjamin Moore, we reiterated our policy principles and noted that "[t]he multiple occurrence **65 template is a matter of substance that is at the heart of Owens-Illinois." 179 N.J. at 104, 843 A.2d 1094. The theory
triggers multiple policies, thus maximizing resources available for toxic tort cases. It is what encourages the purchase of insurance. It is what voids "other insurance" clauses. It is what makes "non-cumulation" clauses inapplicable. It is what requires a calculation of the loss that occurred during each policy period. It is our effort to regularize the essentially irregular progressive environmental damage case and make it amenable to disposition in accordance with the undertakings in the insurance contract.
[ Id. at 104-05, 843 A.2d 1094.]
Most importantly, as discussed previously, the theory holds insurers responsible for the losses that actually occur on their watch, using a formula that approximates "a scientific assessment of the amount of injury," even if the actual injury manifests later. Id. at 105, 843 A.2d 1094. We have articulated those principles in a number of settings. See, e.g., Spaulding, 176 N.J. 25, 819 A.2d 410 ; Quincy Mut. Fire Ins. Co. v. Borough of Bellmawr, 172 N.J. 409, 799 A.2d 499 (2002) ; Carter-Wallace, 154 N.J. 312, 712 A.2d 1116.
On appeal, the policy implications of the unavailability rule has been a focus of an amici that seeks the total elimination of the unavailability exception. Travelers also maintains that assumption of tort risk should factor into the establishment of a *323 coverage block, eliminating application of the unavailability rule when a company continues to manufacture a product after commercial insurance is no longer available.
Clearly, the law on allocation methodology differs among the states. Other states have adopted policies different from the "continuous-trigger" and "unavailability exception" theories embraced by New Jersey. See, e.g., Arceneaux v. Amstar Corp., 200 So.3d 277, 287-88 (La. 2016) ; KeySpan Gas E. Corp. v. Munich Reins. Am., Inc., 73 N.Y.S.3d 113, 96 N.E.3d 209, 214-16 (2018) ; Bradford Oil Co. v. Stonington Ins. Co., 190 Vt. 330, 54 A.3d 983, 991-92 (2011). In the debate over the suitability of adopting an Owens-Illinois approach, the discussions are noticeably context-dependent.[4]
**66 No doubt, legitimate policy reasons may have led sister courts to reach diverse conclusions regarding each one's allocation analysis and whether an unavailability exception is sensible in a particular scheme. Compare Sybron Transition Corp. v. Sec. Ins. of Hartford, 258 F.3d 595, 599-600 (7th Cir. 2001) (commenting on idea that insurance can be "available" or "unavailable"), and Crossmann Cmtys. of N.C., Inc. v. Harleysville Mut. Ins. Co., 395 S.C. 40, 717 S.E.2d 589, 594-95, 599-601 (2011) (adopting "time-on-risk" approach to "forward[ ] important policy goals" and preserve incentive for business to purchase sufficient insurance, promoting stability in insurance market), with R.T. Vanderbilt Co. v. Hartford Accident & Indem. Co., 171 Conn.App. 61, 156 A.3d 539, 573-74 (adopting continuous-trigger theory in asbestos case because substance immediately injures body following exposure and theory accounts for unknowns in progression of disease, and continuous-trigger analysis is "the fairest and most efficient way to distribute indemnity and defense costs"), certif. granted, 327 Conn. 923, 171 A.3d 62; 327 Conn. 923, 171 A.3d 63 (2017).
In Owens-Illinois we acknowledged that "[i]f, after experience, we are convinced that our solution is inefficient or unrealistic, we will not hesitate to revisit" the allocation paradigm with its continuous-trigger and unavailability doctrines. 138 N.J. at 478, 650 A.2d 974. This appeal, however, does not present a compelling vehicle to reconsider our precedent on allocation. It specifically does not present a proper factual basis to revisit the unavailability rule that **67 is part of the coherent principles that comprise our allocation methodology.
The record in this appeal, carefully addressed by the trial court, indisputably demonstrates when insurance became unavailable in the marketplace. Importantly, none of the initial asbestos exposures, on which claims Honeywell is seeking insurance coverage, occurred after insurance became unavailable. The claimants initially were exposed to asbestos at times when the manufacturer was covered by the excess insurance policies at issue. Although the disputed policies involved in this appeal *324 concern excess insurance, we are dealing with occurrence policies. Further, we are addressing claims pertaining to exposure to asbestos during the policy periods claimed to have caused progressive asbestos-related disease. See Owens-Illinois, 138 N.J. at 454, 650 A.2d 974 (confirming injury to body tissue occurs on inhalation through exposure to asbestos fibers).
This case simply does not present facts on which to consider abandoning the unavailability exception, let alone whether to create a novel equitable exception to that exception that would retroactively deprive parties of paid-for insurance coverage due to their post-coverage-period conduct. Sufficient justification for even contemplating taking steps to alter our allocation methodology, with its unavailability rule, is absent here. The continued application of the unavailability rule supports the public policy objectives originally intended by our prorated allocation methodology.
For the reasons that preceded in this opinion's discussion of the trial court's motion practice, we agree with the Appellate Division that the trial court correctly kept its focus on whether Honeywell could reasonably have purchased insurance for asbestos-related claims. The assumption-of-risk language in Owens-Illinois, in context, addressed only assumption of an insurance risk for the existing claim periods when insurance was reasonably available but the insured elected not to purchase it. That is not what has happened here. Moreover, we decline to upend this long-litigated **68 dispute to recognize here an equitable exception to the unavailability rule.
In light of the extended litigation and the fact that the manufacturer ceased producing these friction products seventeen years ago, we decline to disrupt the coverage block of insurance fixed by the trial court, which resulted in maximizing the insurance resources available for claimants. Indeed, the basic policy objectives of Owens-Illinois-of maximizing insurance resources, encouraging the spreading of risk throughout the insurance industry, promoting the purchase of insurance when available, and of simple justice-are all served by affirming the judgment and moving to closure this mammoth allocation dispute, going back to 1940 through to the ending of insurance availability in 1987. Further, we reject that this holding will disincentivize manufacturers from responsible behavior regarding products for which insurance becomes unavailable, for whatever reason may be discernable. This manufacturer ceased its production. Our affirmance of the insurance coverage block established in this matter is rooted in the overall record before us. To the extent that our dissenting colleague would use this case to have this matter address alterations to the continuous-trigger concept as it was originally fashioned, and to the Owens-Illinois allocation paradigm, in order to promote social policy regarding tort law, that invitation is not one that these circumstances compel us to accept.
V.
The judgment of the Appellate Division is affirmed.
CHIEF JUSTICE RABNER and JUSTICES FERNANDEZ-VINA, SOLOMON, and TIMPONE join in JUSTICE LaVECCHIA's opinion. JUSTICE ALBIN filed an opinion, dissenting in part. JUSTICE PATTERSON did not participate.
JUSTICE ALBIN, dissenting in part.
This Court is the steward of the common law, charged with the responsibility of developing legal principles that will promote fairness and good public policy in our *325 system of justice. Today's **69 majority opinion is at odds with that charge. The majority has taken a single obscure phrase in Owens-Illinois, Inc. v. United Insurance Co., 138 N.J. 437, 479, 650 A.2d 974 (1994), to perpetuate a doctrine that incentivizes corporations to manufacture products that are dangerous, and even lethal, to the mechanics and others who work with them.
As applied here, the judicially created doctrine known as the "unavailability exception" gives a corporation a free pass if it continues to expose workers to extremely dangerous products after insurance coverage becomes unavailable. Under the unavailability exception, this Court compels insurance carriers that previously insured the corporation-but later refuse to do so-to remain the guarantors for claims arising during the years the corporation continues to manufacture its dangerous products. This misguided application of the doctrine does not further notions of fairness or a rational public policy, as is evident from this case.
Since 1940, The Bendix Corporation (Bendix)[1] secured insurance coverage for the brake and clutch pads it manufactured and sold. Those brake and clutch pads contained asbestos, a dangerous substance, which if inhaled by a worker can cause various respiratory diseases and even increase the risk of developing certain cancers -diseases that result many times in death. See Centers for Disease Control and Prevention, Health Effects of Asbestos, https://www.atsdr.cdc.gov/asbestos/health_effects_asbestos.html (last updated Nov. 3, 2016). Beginning in 1975, Bendix faced asbestos-related personal-injury claims from individuals across the country. By 1987, there were over 2,600 claims filed against Bendix for injuries allegedly caused by the asbestos-containing brake and clutch pads. Then, in 1988 alone, the number of claims soared to more than 3,600.[2]
**70 By 1985, the Centers for Disease Control and Prevention (CDC) had recognized the increased harm related to extended exposure to asbestos. See, e.g., Centers for Disease Control and Prevention, NIOSH: Health Hazard Evaluation Report 5 (June 1985), https://www.cdc.gov/niosh/hhe/reports/pdfs/83-44-1596.pdf (describing asbestosis as "form of pulmonary fibrosis secondary to the accumulation of airborne asbestos in the lungs"). Not only is duration of exposure a risk factor in whether individuals eventually manifest an asbestos-related injury, it is also correlated with the severity of the injury. Ibid. (noting that severity of disease is correlated with type and duration of exposure to asbestos).
Given the apparent health hazards and number of pending and expected personal-injury lawsuits relating to Bendix's brake and clutch pads, the primary insurance carriers in 1986 and then the excess insurers in 1987 declined to underwrite coverage for those products. Despite the known medical dangers of asbestos, more than a decade of lawsuits, and an insurance marketplace that refused to provide coverage for its asbestos products, Bendix opted to continue to manufacture its asbestos-containing *326 brake and clutch pads for fourteen more years without liability coverage. Bendix's decision put at risk the health and safety of countless workers exposed to the dangerous asbestos fibers in its products over those fourteen years.
Now, a majority of the Court holds that Bendix, though it paid no premiums for coverage, is insured for the injuries caused to mechanics and others who worked with the products it continued to manufacture-so long as the first asbestos exposure predated the period when the company went bare of insurance. According to the majority, the insurance carriers that previously issued liability policies to Bendix must pick up this grisly tab. Of course, in the future, companies similarly situated to Bendix will have less **71 incentive to stop producing dangerous products under such a scheme.
In my view, we have reached this point so in conflict with good public policy by not giving a common-sense reading to Owens-Illinois, a landmark case intended to further the public welfare. Owens-Illinois constructed a methodology to allocate insurance coverage among multiple policies in cases of progressive toxic diseases that run a course of years from the first exposure to the manifestation of the disease. 138 N.J. at 478-79, 650 A.2d 974. Implicit in the discussion on allocation methodology is the understanding that duration of asbestos exposure is linked to disease. Id. at 474-75, 650 A.2d 974. Because of the impossibility of quantifying the extent of harm caused to an individual in any particular year, the Court, as a matter of public policy, decided to "treat the progressive injury or damage as an occurrence within each of the years [of a comprehensive general liability] policy." Id. at 468, 478, 650 A.2d 974 (emphasis added). The allocation scheme spread the costs of indemnification coverage among the triggered policies from the time of exposure to manifestation of the disease based on the risk assumed by the carrier and its years on the risk. Id. at 475, 650 A.2d 974. The Court adopted that paradigm because equity and notions of simple justice demanded that it do so. Id. at 472-73, 650 A.2d 974.
The Court also recognized that a company might determine to go without insurance for a period of years and, under those circumstances, the allocation scheme includes the company's pro rata contribution, depending on its time on the risk and the degree of the risk it assumed. Id. at 479, 650 A.2d 974. The language in Owens-Illinois that is at the core of the controversy arises from one seemingly obscure phrase. The Court stated, "[w]hen periods of no insurance reflect a decision by an actor to assume or retain a risk, as opposed to periods when coverage for a risk is not available, to expect the risk-bearer to share in the allocation is reasonable." Ibid. (emphasis added). The quoted clause is known as the unavailability exception. Owens-Illinois mentions the "unavailability"
**72 of insurance in passing. There is no further explanation or support given for the clause.
One logical interpretation of that clause accords with the notions of fairness and simple justice advanced in Owens-Illinois. If insurance is unavailable to a company for a product that it has stopped manufacturing, the insurance carriers that issued occurrence policies in prior years remain on the risk through the time until the disease manifests. No one would dispute the application of the allocation scheme in that manner.
It is another thing, however, to say that a company, such as Bendix, that continues to manufacture an inherently dangerous product for which no insurance carrier will provide liability coverage can avoid full financial accountability and transfer the risk to prior insurers. Such a system runs *327 counter to the principles of fairness and justice enunciated in Owens-Illinois and those underlying our tort law. Other courts have also acknowledged the absurdity of applying the unavailability exception to actors like Bendix. See, e.g., R.T. Vanderbilt Co. v. Hartford Accident & Indem. Co., 171 Conn.App. 61, 156 A.3d 539, 585-88 (2017) (recognizing that application of unavailability exception might provide corporate actor "a windfall at its insurers' expense" because "insurers might have to defend and indemnify claims for injuries that would not have occurred, or that would have been less severe, but for [the actor]'s decision to continue to sell [an asbestos-containing product]").
Equity demands that a corporation that continues to manufacture a dangerous product without insurance become the ultimate insurer for its actions. Justice O'Hern-the author of Owens-Illinois-reminds us that corporate actors should "know that if they do not transfer to insurance companies the risk of their activities that cause continuous and progressive injury, they may bear that untransferred risk." See 138 N.J. at 473, 650 A.2d 974.
The unavailability exception, as applied by the majority, removes Bendix's corporate accountability as a self-insurer for those workers first exposed to Bendix asbestos products before 1987 and **73 in the fourteen years that it continued to manufacture its dangerous products. By diluting Bendix's responsibility as a self-insurer, the majority's decision fails not only to deter corporate risk-taking at the expense of public health, but rather gives an incentive to such risk-taking because there is no full financial reckoning for continued bad behavior. By holding companies accountable for their irresponsible conduct, tort law has a salutary deterrent effect. Although the dominant force motivating most companies is to increase profits, one of the major purposes of the common law is to promote the public health and welfare of our citizens.
The majority's decision also interferes with the natural flow of market forces, which, if left untouched, would advantage the public. When insurance carriers no longer provide coverage for the continued manufacture of a product endangering the public health because of the prospect of financially ruinous lawsuits, the marketplace is making a definitive statement that whatever good the product offers is outweighed by the risk. Under such circumstances, the natural course of events might lead the company to abandon the manufacture of the dangerous product.
But, if insurance carriers that previously provided coverage for the product must-by the fiat of the Court-insure the risk against their will, then corporations can send their potentially deadly wares into the stream of commerce knowing that they will not bear the full risk in doing so. The perverse logic of this scheme is evident here.
Bendix continued to manufacture asbestos-containing brake and clutch pads for fourteen years after insurance was no longer available. For fourteen years, workers exposed to asbestos fibers before 1987 remained exposed to the potentially deadly toxin, increasing their risk of contracting various serious and lethal diseases. Yet, Bendix now gets-and future similarly situated companies will get-a windfall bailout because this Court has conscripted insurance carriers into paying the bill.
The Owens-Illinois Court had in mind an equitable allocation formula-not the twisted one that has taken root from a single **74 difficult-to-decipher clause in an opinion intended to promote the public welfare. Nor did the Court expect that its opinion would be "the 'last word' in this area." *328 Owens-Illinois, 138 N.J. at 478, 650 A.2d 974 (quoting N. States Power Co. v. Fid. & Cas. Co., 523 N.W.2d 657, 665 (Minn. 1994) ). Indeed, it instructed a future Court to "revisit the issue [of coverage for long-term exposure injury]" if the solution provided is "inefficient or unrealistic." Ibid.
I expect that insurance carriers will adjust to this new methodology. Knowing that they will be compelled to provide coverage, whether they wish to or not, carriers may decide to offer coverage at much higher premiums-thus rendering insurance available for products that would have been uninsurable.
I do not believe that the path that the majority is taking can be justified by Owens-Illinois or sound public policy. I believe that the majority is making a critical error in allowing the unavailability exception to extend to claims of workers whose first asbestos exposure occurred before 1987 but whose diseases progressed during the fourteen years that Bendix continued to expose them to the potentially lethal fibers-despite the absence of insurance coverage. "[T]o send the correct signals to the economic system, a judge must appreciate the consequences of legal decisions on future behavior." Id. at 473, 650 A.2d 974 (alteration in original) (citation omitted).
This case is not just about Bendix or asbestos products, but about the signal this Court gives to corporate actors who must assess costs and risks-and profits-when deciding whether to unloose their uninsured dangerous products on the public or their uninsured dangerous substances into the environment.
I therefore respectfully dissent from the part of the majority opinion addressing the unavailability exception. I concur in the Court's conflict-of-law analysis and resolution.

Because St. Paul had not filed a motion before the trial court for the application of Michigan law and did not oppose Honeywell's motion asking the court to apply New Jersey law, its policies were not considered by the panel for purposes of this first issue.

We acknowledge the argument that Michigan does not have a settled policy because of a Michigan Court of Appeals decision that conflicts with Arco. To support that position, Honeywell cites to a subsequent unpublished Court of Appeals opinion that adopted an "all sums" method of allocation, mandating that the insurers must pay all of the insured's liability without temporal limitations. However, unpublished decisions in Michigan are not precedential and not binding, see Mich. Ct. R. 7.215(C)(1), and therefore such opinions cannot affect our analysis in this case.

Notably, other courts regard Michigan as applying a pro rata allocation method that employs the time-on-the-risk approach. See Decker Mfg. Corp. v. Travelers Indem. Co., 106 F.Supp.3d 892, 895 (W.D. Mich. 2015) ; Alticor, Inc. v. Nat'l Union Fire Ins. Co. of Pa., 916 F.Supp.2d 813, 832-33 (W.D. Mich. 2013) ; Century Indem. Co. v. Aero-Motive Co., 318 F.Supp.2d 530, 545 (W.D. Mich. 2003).

Indeed, not all cases line up as reviewing progressing injury from asbestos or other harmful substances, but instead arise in alternate contexts, such as interpretation of traditional pollution exclusion clauses. See, e.g., Md. Cas. Co. v. W.R. Grace & Co., 794 F.Supp. 1206, 1229 (S.D.N.Y. 1991) ("One would not usually associate asbestos with the substances listed in the exclusion, namely, smoke, fumes or waste. Those substances bear a closer relation to industrial pollution, the usual subject of the ordinary pollution exclusion." (citation omitted) ); Pub. Serv. Co. v. Wallis & Cos., 986 P.2d 924, 939-40, 943 (Colo. 1999) (rejecting continuous-trigger theory in pollution context); Am. Bumper & Mfg. Co. v. Hartford Fire Ins. Co., 452 Mich. 440, 550 N.W.2d 475, 484 (1996) (declining to adopt either occurrence-manifestation theory or continuous-trigger theory).

Defendant Honeywell International, Inc. is the corporate successor to Bendix and now responsible for all asbestos liabilities attributed to Bendix. Ante at 70-72, 188 A.3d at 326-27.

As of 2007, approximately $504,000,000 had been paid out on over 28,000 claims related to those products. Over 80 percent of the total settlement dollars were for mesothelioma cases. Mesothelioma is a rare cancer that may not manifest until thirty to forty years after exposure. See Centers for Disease Control and Prevention, Health Effects of Asbestos, https://www.atsdr.cdc.gov/asbestos/health_effects_asbestos.html (last updated Nov. 3, 2016).