**NOT FOR PUBLICATION WITHOUT THE
APPROVAL OF THE APPELLATE DIVISION**

This opinion shall not "constitute precedent or be binding upon any court." Although it is posted on the internet, this opinion is binding only on the parties in the case and its use in other cases is limited. R. 1:36-3.

SUPERIOR COURT OF NEW JERSEY
APPELLATE DIVISION
DOCKET NO. A-0491-24

TJ ROCCO ENTERPRISES,
LLC,

      Plaintiff-Appellant,

v.

BP LUBRICANTS, USA,
INC.,

      Defendant-Respondent.

_____

Argued October 21, 2025 – Decided November 13, 2025

Before Judges Gilson, Firko, and Vinci.

On appeal from the Superior Court of New Jersey, Law Division, Passaic County, Docket No. L-3515-21.

Ronald J. Ricci argued the cause for appellant (Ricci & Fava, LLC, attorneys; Ronald J. Ricci, of counsel and on the briefs).

Liana M. Nobile argued the cause for respondent (Maron Marvel Bradley Anderson & Tardy LLC, attorneys; Liana M. Nobile, of counsel and on the brief).

PER CURIAM

In this breach of contract action, plaintiff TJ Rocco Enterprises, LLC (TJ) appeals from a September 27, 2024 order granting summary judgment to defendant BP Lubricants U.S.A., Inc. (BP) and dismissing TJ's complaint with prejudice. For the reasons that follow, we affirm in part and reverse and remand in part for further proceedings.

I.

The following material facts are viewed in the light most favorable to TJ as the non-moving party. Templo Fuente De Vida Corp. v. Nat'l Union Fire Ins. Co. of Pittsburgh, 224 N.J. 189, 199 (2016). On April 14, 2011, the parties entered into a Professional Services Agreement (the Agreement), under which TJ agreed to operate "LJ's Café" and a catering service at BP's corporate office located in Wayne. TJ prepared most of the food at its Wallington facility.

On March 9, 2020, Governor Philip D. Murphy issued Executive Order (EO) 103, declaring a state of emergency and public health emergency in New Jersey as a result of the COVID-19 pandemic. Two days later, BP's Wayne facilities manager Steve Campbell advised TJ that the Wayne location was closing for in-person work and would not conduct cafeteria services while its employees were encouraged to work remotely.

A-0491-24

On March 13, 2020, Amendment Three to the original Agreement was signed, which increased the weekly subsidy BP was required to pay TJ from the previous amendment. The weekly subsidy would be based on total sales at LJ's Café, exclusive of any catering services provided. Amendment Three provides:

> 3. The first bullet in the Weekly Subsidy section of Schedule A[1] Number [four] is updated to have a 2.5% increase from the 2019 weekly subsidy which was previously 5%.
>
> Subject to the yearly subsidy cap below, BP <u>shall</u> pay LJ's [Café] a weekly subsidy as set forth below <u>based on actual weekly sales in the café</u> (which excludes catering) to support LJ's cost of doing business at the Wayne facility.
>
> On weekly sales of up to $1,125 the subsidy guarantee is $1,632.72.
>
> On weekly sales from $1,126 up to $1,750 the guarantee is $2,247.72.
>
> On weekly sales from $1,751 up to $2,500 the guarantee is $2,555.21.
>
> On weekly sales from $2,501 up to $3,000 the guarantee is $2,965.21.
>
> On weekly sales above $3,001 the guarantee is $3,272.71.
>
> [(emphasis added)].

---

[1] Schedule A is not included in the appendices.

A-0491-24

Amendment Three was negotiated through emails between Guiseppi Scirocco, TJ's owner and managing member, and Walter Kamienski, BP's former regional procurement manager. The emails primarily discussed the Agreement's application of the consumer price index (CPI)[2] and the Third Amendment's extension of the Agreement term. At his deposition, Kamienski testified the CPI index is a measure of the labor costs for services that either increase or decrease over a twelve-month period. Amendment Three increased the weekly subsidy by 2.5%, from the previous 5% agreed to in the Second Amendment entered into in 2019.

Kamienski testified that Scirocco sought a more substantial subsidy increase than what TJ had proposed in its version of the amendment. Scirocco countered that he did not discuss Amendment Three with members of the procurement department—Kamienski or Campbell—and that the proposed Third Amendment was merely sent to him for his review in March 2020. At his deposition, Scirocco testified that the last day LJ's Café provided any kind of cafeteria service to BP was around March 20, 2020.

---

[2] CPI is a metric calculated by the Bureau of Labor Statistics which tracks the rate of inflation from an analysis of certain goods and services that consumers purchase. Nichole Stohler, Rent Increase by CPI: A Guide for Landlords and Tenants, Azibo, (June 20, 2024), https://www.azibo.com/blog/rent-increase-by-cpi.

A-0491-24

Scirocco described the weekly subsidy under the Agreement as a "tiers" system.  He testified how in recent years, the tiers were increased by a certain amount each year, based upon the CPI, and these increases were "structurally put into the contract."  The bottom tier, however, "has always been [the] cost of business . . . [the] rent, [the] utilities, [and] the cost of doing business in that building."  Kamienski similarly testified that the subsidy was to support TJ's cost of doing business at the Wayne facility or for "operating costs," in relation to staff and service at the cafeteria.  Kamienski further testified the subsidy allowed BP to keep prices down so that people would utilize LJ's Café as much as possible.

Additional new terms under Amendment Three extended the contract's term to a twenty-four-month period, making the new expiration date December 31, 2021, with a retroactive effective date of January 1, 2020.  Under the Agreement, Kamienski alleged TJ was compensated from two avenues:  first, through the subsidy based on sales, and second, through "the gate," meaning what TJ would collect at the register from sales.  Before Kamienski signed Amendment Three on behalf of BP, he spoke with Campbell and a member of his team, Justin DeJoseph, who was authorized to execute Amendment Three.

A-0491-24

On March 17, 2020, BP closed its Wayne facility, permitting only essential employees to work in person, such as security, facilities management, and leadership personnel. On March 21, 2020, Governor Murphy implemented EO 107, encouraging businesses to accommodate remote work arrangements with the goal of reducing the number of employees working in-person. EO 107 encouraged cafeterias and food courts to stay open with the limitation that services consist of delivery or take-out services only.

BP continued to pay TJ its weekly subsidy as required under the Agreement through March 27, 2020. However, BP ceased making any weekly subsidy payments to TJ thereafter. Kamienski testified he emailed Scirocco that BP was authorizing payment for two of TJ's March 2020 invoices. Kamienski advised Scirocco that TJ should stop servicing the Wayne location until otherwise directed. Kamienski explained the two invoices were a "measure of good faith that would be within [Campbell's] budget and [his] approval . . . informing [Scirocco] to stand down on providing services." Since 2011, Scirocco had submitted invoices to BP, even if BP was closed for a period of time. However, Scirocco did not send an invoice to BP after April 30, 2020, based on his understanding that he was anticipating conversations with Kamienski regarding LJ's Café's potential re-opening.

A-0491-24

Campbell testified that from March 2020 to June 2020, security personnel returned to work in person, and in April 2020, more employees returned as well, increasing the amount of security and facilities employees present on site. Kamienski testified that return to work in BP's office was subject to the employee's discretion. Kamienski stated he returned to the office infrequently, usually once or twice a month, from April 2020 to December 2021, to connect with the staff and discuss business.

Scirocco testified that after March 2020, he continued to operate LJ's Café and incurred costs necessary to ensure TJ was prepared and ready to return to BP at any time to provide food services. Scirocco estimated TJ's cost of business from April 1, 2020, to December 21, 2021, was $300,000 for the ninety-two-week period—an average of $3,300 per week. Kamienski recalled conversations with Scirocco during the pandemic regarding alternative food service options, such as grab-and-go services.

On April 10, 2020, Kamienski emailed Scirocco about the weekly subsidy payments: "[g]oing forward . . . in accordance with our contract, payment will only be rendered when there are actual weekly sales in [LJ's] café . . . provided and therefore to support LJ's [Café's] cost of doing business at the Wayne facility." Kamienski alleged Scirocco did not respond to this communication.

7

At his deposition, Kamienski further explained his understanding of the Agreement as previously represented in his email:

> TJ's counsel: So it's your interpretation of this contract, . . . if [LJ's Café] sold one . . . Tootsie Roll and made five cents, . . . [TJ] was entitled to $1,632.72; is that correct?
>
> Kamienski: I would more characterize it if he had a weekly sale that he would be eligible for the subsidy.
>
> TJ's counsel: How much did the weekly sale have to be for him to be eligible for [the] subsidy?
>
> Kamienski: It would have to exist. It would have to be a monetary amount.
>
> TJ's counsel: So it could have been a Tootsie Roll for 15 cents; is that correct?
>
> Kamienski: Theoretically, yes.

In response to Kamienski's April 10, 2020 email, Scirocco believed Kamienski was misreading the Agreement. On April 14, 2020, Scirocco spoke to Kamienski regarding the Agreement's wording, and "reminded him that there is a cost of business for LJ's [Café] to provide services at BP." Scirocco testified Kamienski "understood" and would get back to him. In an April 1, 2020 email, Campbell advised Scirocco regarding "things that we need to think about when the time comes for re-opening."

8

Scirocco met with Joseph Abuso, the corporate food and beverage director of BP, and Campbell, in April and May of 2020, about a possible re-opening in the Wayne facility and what the protocols would be. On May 13, 2020, Governor Murphy implemented EO 142, which permitted the re-opening of non-essential retail businesses to the public. Kamienski advised Scirocco that BP would compensate TJ for two invoices in March 2020, and that TJ should stop serving BP's Wayne location "until otherwise directed." Scirocco testified that September 1, 2020, was the potential re-opening date for LJ's Café, but it never reopened.

On November 10, 2020, Campbell conducted a performance evaluation of LJ's Café. In winter of 2021, LJ's Café was renovated. Scirocco maintained that following March 2020, TJ was "prepared and ready to return to BP at any time to provide food services." Scirocco claimed BP neither canceled the Agreement nor asked to renegotiate its terms. BP's employees ultimately returned to the Wayne facility, but TJ was not asked to provide food services.

On November 3, 2021, TJ filed a two-count complaint against BP alleging breach of contract and breach of the implied covenant of good faith and fair dealing.[3] TJ sought compensatory and pecuniary damages, and attorney's fees.

---

[3] The complaint mistakenly states fair "demand."

Following the close of discovery, BP moved for summary judgment on the basis the Agreement contains a force majeure clause "excusing either [or] both parties from performance under the [Agreement] if a failure or delay to perform was caused by Acts of God, acts of the government in either its sovereign or contractual capacity, epidemics, quarantine restrictions, or the like."

TJ opposed BP's motion for summary judgment and contended BP did not demonstrate the closure of its Wayne facility was required by government action in response to the COVID-19 pandemic, and thus, the force majeure clause did not apply. In addition, TJ argued that even if the force majeure clause was triggered, it did not apply to the "contractually required subsidy guarantee" in the Agreement because BP did not assert and cannot prove the COVID-19 pandemic created an "inability to pay."

On September 27, 2024, the court conducted oral argument and issued an order that day granting BP's motion for summary judgment and dismissing TJ's complaint with prejudice. In a written statement of reasons accompanying the order, the court determined that the force majeure clause had come into effect because of EO 107 and excused both parties from performance under the Agreement. The court found EO 107 caused the shutdown, not an Act of God. The court noted that EO 107 required businesses to accommodate telework

arrangements for their workforces and to reduce on-site staff, reasoning it was analogous to a quarantine restriction, which was specifically provided for in the Agreement. This appeal followed.

On appeal, TJ presents the following arguments for our consideration:

(1) the force majeure clause did not come into effect;

(2) government action did not cause BP to fail to pay the guaranteed subsidy;

(3) the force majeure clause did not automatically terminate the Agreement;

(4) BP was precluded from asserting the force majeure clause as a defense because Amendment Three was executed on March 13, 2020, during the COVID-19 pandemic; and

(5) TJ has a valid breach of the implied covenant and good faith and fair dealing claim.

II.

We review de novo the grant of summary judgment, applying the same standard as the motion judge. Branch v. Cream-O-Land Dairy, 244 N.J. 567, 582 (2021). That standard requires us to "determine whether 'the pleadings, depositions, answers to interrogatories and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact

challenged and that the moving party is entitled to a judgment or order as a matter of law.'" Ibid. (quoting R. 4:46-2(c)).

"To decide whether a genuine issue of material fact exists, the trial court must 'draw[] all legitimate inferences from the facts in favor of the non-moving party.'" Friedman v. Martinez, 242 N.J. 449, 472 (2020) (alteration in original) (quoting Globe Motor Co. v. Igdalev, 225 N.J. 469, 480 (2016)). "[The] trial court's interpretation of the law and the legal consequences that flow from established facts are not entitled to any special deference." Manalapan Realty, L.P. v. Twp. Comm. of Manalapan, 140 N.J. 366, 378 (1995).

"The polestar of contract construction is to discover the intention of the parties as revealed by the language used by them." Karl's Sales & Serv., Inc. v. Gimbel Bros., Inc., 249 N.J. Super. 487, 492 (App. Div. 1991). In order to do so, the language used must be interpreted "'in accord with justice and common sense.'" Ibid. (citing Krosnowski v. Krosnowski, 22 N.J. 376, 387 (1956)). "An agreement must be construed in the context of the circumstances under which it was entered into and it must be accorded a rational meaning in keeping with the express general purpose." Tessmar v. Grosner, 23 N.J. 193, 201 (1957).

Unambiguous language controls the rights and obligations of the parties, even if it was unwise in hindsight. The court will not make a "more sensible

A-0491-24

contract than the one" the parties made for themselves. <u>Kotkin v. Aronson</u>, 175 N.J. 453, 455 (2003). The parties, especially sophisticated ones like the commercial parties involved in this case, are generally in the best position to determine their respective needs and obligations in negotiating a contract. <u>Brundage v. Est. of Carambio</u>, 195 N.J. 575, 601 (2008).

The initial Agreement between TJ and BP included a choice-of-law provision, stating Illinois law will govern any future dispute between the parties. The Agreement's choice-of-law provision states:

> THIS AGREEMENT SHALL BE CONSTRUED AND THE LEGAL RELATIONS BETWEEN THE PARTIES DETERMINED IN ACCORDANCE WITH THE LAWS OF THE STATE OF ILLINOIS, USA, WITHOUT GIVING EFFECT TO ANY CHOICE[-] OF[-]LAW RULES WHICH MAY DIRECT THE APPLICATION OF THE LAWS OF ANY OTHER JURISDICTION.

In reviewing a trial court's determination of a choice-of-law analysis, we are to consider the matter de novo, with no deference to the trial court's views. <u>See</u> <u>Manalapan Realty, L.P.</u>, 140 N.J. at 378. New Jersey courts apply this State's choice-of-law rules in deciding whether New Jersey law or another state's law governs. <u>McCarrell v. Hoffmann-La Roche, Inc.</u>, 227 N.J. 569, 583 (2017); <u>see</u> <u>also</u> <u>Instructional Sys. v. Comput. Curriculum Corp.</u>, 130 N.J. 324, 341 (1992) (ordinarily, New Jersey courts will uphold a choice-of-law provision so

A-0491-24

long as it does not violate New Jersey's public policy). However, in a choice of law analysis, the first step is to "decide whether there is an actual conflict between the laws of the states with interests in the litigation." Cont'l Ins. Co. v. Honeywell Int'l, Inc., 234 N.J. 23, 46 (2018). Any such conflict is "determined on an issue-by-issue basis." Veazey v. Doremus, 103 N.J. 244, 248 (1986).

An actual conflict of law "requires a 'substantive difference' between the laws of the interested states." Cont'l, 234 N.J. at 46 (quoting DeMarco v. Stoddard, 223 N.J. 363, 383 (2015)). "A 'substantive difference' is one that 'is offensive or repugnant to the public policy of this State.'" Ibid. (quoting DeMarco, 223 N.J. at 383).

If an actual conflict does exist, courts apply the "most significant relationship" test, which focuses on the state which has the most meaningful connections with the transaction and the parties in issue. State Farm Mut. Auto. Ins. Co. v. Est. of Simmons, 84 N.J. 28, 34 (1980). However, if no actual conflict is present, then "the choice-of-law question is inconsequential, and the forum state applies its own law to resolve the disputed issue." Rowe v. Hoffmann-La Roche, Inc., 189 N.J. 615, 621 (2007). Here, based upon our de novo review, because there is no substantive difference regarding how New Jersey courts and Illinois courts interpret force majeure clauses, and no actual

A-0491-24

conflict exists, we apply New Jersey law as the forum state. Cont'l, 234 N.J. at 46. TJ does not challenge the choice-of-law provision on appeal. Moreover, at oral argument before us, all counsel agreed that there were no differences between the laws of New Jersey and Illinois concerning contract law and force majeure issues.

III.

First, we address TJ's argument that the force majeure clause did not come into effect. TJ contends the force majeure clause did not excuse BP's performance under the Agreement because there "was no government action" that prevented BP from its "contractual obligation" to repay TJ the "guaranteed subsidy." TJ asserts that even if BP's decision to close LJ's Café was a "business decision," the government closures and quarantine resulting from COVID-19 were "very temporary." TJ also argues that if EO 107 applies to BP under the force majeure clause, it does not excuse BP's nonperformance for the entire duration of the two-year term under the Agreement.

The force majeure clause states:

> Neither Party shall be responsible for any failure to perform or delay in performing any of its obligations under this Agreement where and to the extent that such failure or delay results from causes <u>outside the reasonable control of the Party.</u> Such causes shall include, without limitation, Acts of God or of the public

15

enemy, <u>acts of the government in either its sovereign</u> or contractual capacity, fires, floods, <u>epidemics</u>, <u>quarantine restrictions</u>, freight embargoes, civil commotions, or <u>the like</u>. Notwithstanding the above, strikes and labor disputes shall not constitute an excusable delay for either Party under this Agreement.

[(emphasis added)].

BP counters EO 107 excused or delayed its performance and obligations.

In relevant part, EO 107 states:

All New Jersey residents <u>shall</u> remain home or at their place of residence unless they are . . . reporting to, or performing, their job.
. . . .

All businesses or non-profits in the State, whether closed or open to the public, <u>must</u> accommodate their workforce, wherever practicable, for telework or work-from-home arrangements.

To the extent a business or non-profit has employees that cannot perform their functions via telework or work-from-home arrangements, the business or non-profit <u>should make best efforts</u> to reduce staff on site to the minimal number necessary to ensure that essential operations can continue.

. . . .

All restaurants, cafeterias, dining establishments, and food courts, with or without a liquor license . . . are permitted to operate their normal business hours, but are limited to offering only food delivery and/or take-out services.

16

[(Exec. Order No. 107, (Mar. 21, 2020), https://nj.gov/infobank/eo/056murphy/pdf/EO-107.pdf) (emphasis added)].

To state a claim for breach of contract, a plaintiff must establish four elements: (1) the parties entered a contract containing certain terms; (2) the plaintiff performed as the contract required; (3) defendant did not perform as required and thus breached the contract; and (4) the breach caused the plaintiff to suffer a loss. Globe Motor Co., 225 N.J. at 482. A force majeure clause within a contract is a defense to a breach of contract claim. Hess Corp. v. ENI Petroleum US, LLC, 435 N.J. Super. 39, 48 (App. Div. 2014). Illinois law is consistent with New Jersey law in its interpretation of force majeure clauses: such clauses are enforceable, but are narrowly construed.

A force majeure clause "provides a means by which the parties may anticipate in advance a condition that will make performance impracticable." Facto v. Pantagis, 390 N.J. Super. 227, 231 (App. Div. 2007). The clause "conditions a party's duty to perform upon the non-occurrence of some event beyond its control and serious enough to interfere materially with performance." Id. at 232. Courts construe a force majeure clause narrowly. Hess Corp., 435 N.J. Super. at 47. For instance, only if the clause "specifically includes the event that actually prevents a party's performance will that party be excused." See Id.

17

at 47-48 (finding the clause inapplicable because the contract failed to specify a specific source of natural gas and only fixed the price, quantity, and delivery point); Facto, 390 N.J. Super. at 227 (upholding the clause because parties specifically identified a "power failure," as a circumstance that would excuse performance).

TJ maintains the force majeure clause should not be interpreted to excuse BP's failure to pay the weekly subsidy payment because the specific words "Executive Order" are not enumerated in the provision. TJ argues this would be a deviation from our decision in Hess that all potential events excusing performance must be specified in a force majeure clause. Hess Corp. 435 N.J. Super. at 47. We disagree.

Here, TJ and BP were unable to perform under the Agreement because of the COVID-19 pandemic and the EOs. Moreover, we conclude the COVID-19 pandemic constituted a "force majeure" under the parties' Agreement, which relieved both parties of their duties to perform under the Agreement. The court correctly found EO 107 falls into the same general nature or category of "quarantine restrictions." Additionally, EO 107 falls into the category of a "government act" in its "sovereign capacity" or "epidemic." See Commc'ns Workers of Am., AFL-CIO v. Christie, 413 N.J. Super. 229 (App. Div. 2010)

(an EO "flows out of the Governor's legislatively-delegated emergency powers to act on behalf of the safety and welfare of the people of New Jersey").  See N.J. Const. art. V, § 1, ¶ 1; 11. ("[t]he executive power shall be vested in a Governor" and "[t]he Governor shall take care that the laws be faithfully executed").  In sum, because EO 107 was a government act, BP was excused from making weekly subsidy payments to TJ pursuant to the force majeure clause in the parties' Agreement.

We are also convinced that COVID-19 satisfies the definition of an "epidemic," although COVID-19 is commonly referred to as a "pandemic." Pandemic is defined as:  an "outbreak of a disease" that "occur[s] over a wide geographic area and affect[s] an exceptionally high proportion of the population."  Merriam-Webster's Collegiate Dictionary 894 (11th ed. 2003).

Similarly, an epidemic is defined as: "any disease which is widely spread or generally prevailing at a given place and time."  Black's Law Dictionary 430 (2nd ed. 1910).  Other sources categorize a pandemic as an epidemic when it has spread over several countries or continents.[4]  Illinois courts have

---

[4] Endemic vs. Epidemic vs. Pandemic: What You Need to Know, Mayo Clinic Health System (Mar. 10, 2022), https://www.mayoclinichealthsystem.org/hometown-health/featured-topic/endemic-epidemic-pandemic

characterized COVID-19 as an epidemic. Hampton v. Williams, 2023 IL App (1st) 220942-U, ¶ 47; Walker v. Demos, 2022 IL App (1st) 210152-U, ¶ 23.

TJ's argument that a force majeure clause triggered by a government order or regulation "must clearly direct or prohibit an act which proximately causes nonperformance or breach of a contract" under Illinois law is equally unavailing.

TJ asserts EO 107 did not require cafeterias such as LJ's Café to shut down but instead required only non-essential retail businesses to close. According to TJ, EO 107 merely required businesses to accommodate remote work arrangements to reduce onsite staff to the minimum necessary for their operations. TJ argues that EO 142, which was implemented on May 13, 2020, allowed non-essential retail businesses to reopen, and therefore, BP's decision to close LJ's Café was a "business decision" not mandated by EO 107.

On this record, EO 107 suspended BP's obligation to pay the weekly subsidy to TJ. Given the limitations imposed by EO 107, we need not look any further. BP notified TJ that it would be closing its Wayne facility pursuant to EO 107, on March 11, 2020, the same day the World Health Organization declared COVID-19 a global pandemic, and two days after Governor Murphy declared a state of emergency in New Jersey. In sum, the force majeure clause in the Agreement was triggered and BP's obligation to pay TJ the weekly subsidy

20

payment was suspended. However, as we next address, the period of time the suspension covers is a disputed material fact. We therefore affirm the order granting summary judgment to BP insofar as the court properly found the force majeure clause was enforceable and triggered.

IV.

We turn to the dismissal of TJ's complaint with prejudice. The court did not address how long the suspension of subsidy payments lasted. There is a genuine issue of material fact as to whether BP ever formally noticed TJ that the Agreement was being terminated based on the conflicting deposition testimony of the parties. The record also presents a disputed issue of material fact as to the date BP reopened its Wayne facility. Moreover, the court did not address whether the force majeure clause ceased to excuse BP's performance under the Agreement after BP reopened its Wayne facility and whether TJ was entitled to any damages for the period of time from any reopening until the Agreement expired in December 31, 2021.

We therefore reverse in part and remand for a determination of these issues by a trier of fact. On remand, the trial court is to reinstate the complaint consistent with our rulings. We express no opinion as to what the outcome of the proceedings on remand should be.

A-0491-24

Affirmed in part and remanded in accordance with this opinion.  We do not retain jurisdiction.

I hereby certify that the foregoing is a true copy of the original on file in my office.

M.C. Harley

Clerk of the Appellate Division

22

A-0491-24